IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:10-CV-251-BO

| | |
|---|---|
| VILLAGE OF BALD HEAD ISLAND,<br>                      Plaintiff,<br><br>v.<br><br>UNITED STATES ARMY CORPS OF<br>ENGINEERS; UNITED STATES OF<br>AMERICA; HONORABLE JOHN<br>MCHUGH, Secretary of the Army, in his<br>official capacity; LIEUTENANT<br>GENERAL ROBERT L. ANTWERP, JR.,<br>United States Army Chief of Engineers,<br>in his official capacity; MAJOR GENERAL<br>TODD T. SEMONITE, Commander, South<br>Atlantic Division, United States Army<br>Corps of Engineers, in his official capacity;<br>and COLONEL JEFFERSON M.<br>RYSCAVAGE, Commander, Wilmington<br>District, United States Army Corps of<br>Engineers, in his official capacity,<br>                      Defendants,<br>            and<br>TOWN OF CASWELL BEACH and<br>TOWN OF OAK ISLAND,<br>                      Defendant-Intervenors | **O R D E R** |

This matter is before the Court on Defendants' Motion to Dismiss, Plaintiff's Motion for Partial Summary Judgment, and Plaintiff's Motion for Preliminary Injunction. A hearing was held on these matters before the undersigned on October 12, 2011, in Raleigh, North Carolina and all matters are ripe for ruling. For the reasons discussed below, Defendants' Motion to Dismiss is granted and all other pending motions are denied as moot.

## BACKGROUND

Plaintiff filed this action on December 28, 2010, against the United States Army Corps of Engineers, its officers, and the United States (hereinafter Defendants or the Corps) alleging several causes of actions arising from the Corps' dredging and maintenance of the Wilmington Harbor Channel. Plaintiff's first six claims are brought under the Administrative Procedures Act (APA), 5 U.S.C. §§ 701 *et seq.*, for violations of agency regulations, the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321 *et seq.*, the Coastal Zone Management Act (CZMA), 16 U.S.C. §§ 1451 *et seq.*, Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, and Section 111 of the Rivers and Harbors Act of 1968, 33 U.S.C. § 426i. Plaintiff also alleges two claims for breach of contract and two claims for breach of maritime contract. Defendant-Intervenors Town of Caswell Beach and Town of Oak Island were permitted to intervene in this action by order entered January 12, 2011.

Bald Head Island and Plaintiff Village of Bald Head Island are located in Brunswick County North Carolina at the confluence of the Cape Fear River and the Atlantic Ocean, directly adjacent to the Wilmington Harbor Channel. Defendant-Intervenors Town of Caswell Beach and Town of Oak Island are also located in Brunswick County, North Carolina, directly adjacent to the Wilmington Harbor Channel. Bald Head Island is situated to the east of the opening of the Channel, while the Towns of Caswell Beach and Oak Island are situated to the west of the opening of the Channel to the Atlantic Ocean.

### Wilmington Harbor

Wilmington Harbor serves as one of North Carolina's two deep-water ports, connecting the port facilities at Wilmington to the Atlantic Ocean through a thirty-seven mile channel that

2

runs along the Cape Fear and Northeast Cape Fear Rivers. (EA § 1.01). The federal government assumed responsibility for managing the Wilmington Harbor in 1829, and has gradually increased the channel width and depth to accommodate the changing types and size of ships that access the port. (EA § 2). In 1996, the Water Resources Development Act authorized three projects to improve the harbor that were subsequently merged into what became referred to as the Wilmington Harbor 96 Act Project (Wilmington 96 Project). (EA § 1.02). The Wilmington 96 Project improvements included deepening ocean entrance channels and widening the channel in certain areas. Due to the discovery of an area of hard rock bottom that would require extensive blasting, which would result in increased costs and environmental harms, the Corps modified its Wilmington 96 Project plans and instead proposed to realign the ocean bar entrance channel (Modified Wilmington 96 Project or the Project) (EA §§ 1.03 - 1.04). The Modified Wilmington 96 Project plans also proposed that beach quality material collected as a result of the realignment dredging be deposited on nearby Brunswick County beaches, specifically Bald Head Island, Caswell Beach, Oak Island, and Holden Beach, as opposed to being dumped at an off-shore ocean dredged material deposit site (ODMDS). The Corps also proposed that beach quality material collected from future maintenance dredging operations would also be deposited on the Brunswick County beaches.

### Environmental Impact of the Modified Wilmington 96 Project

Pursuant to NEPA and the CZMA, the Corps was required to reassess the potential environmental impacts of realigning the ocean bar channel entrance and to obtain a consistency concurrence from the State of North Carolina's Division of Coastal Management. The Corps issued an Environmental Assessment (EA) of the Modified Wilmington 96 Project in February

2000. In the EA, the Corps compared its modified plan of realigning the ocean bar channel entrance with the previously approved plan that was included in the 1996 Final Environmental Impact Statement. Specifically, the Corps discussed the impact of the realignment on the channel itself, the area wildlife and ecosystems, and the coastal communities of North Carolina. With regard to the disposal of beach quality dredged material, the Corps found that the modified plan would allow for the "beneficial use of this sediment and would improve the esthetic qualities of affected beaches and reduce economic threats posed by erosion." (EA § 5.13). Details regarding the depositing of dredged material on Brunswick County beaches were set out in a Sand Management Plan (SMP) that was incorporated by reference in and attachment to the EA.

*SMP*

The SMP addresses the methods of disposal of material recovered from the initial realignment and subsequent maintenance dredging of the Wilmington Harbor Channel. It notes that "[y]ears of research by the [Corps] and practical knowledge gained from the operation of the numerous coastal navigation projects around the country has resulted in the realization that the littoral material must be conserved." (SMP ¶ 20). The Corps determined that depositing beach quality dredged materials on the Brunswick County beaches both helped address ongoing erosion occurring on the neighboring beaches and was the least costly disposal method for the Corps, satisfying the Corps' policy to "regulate the discharge of dredged material from its projects to assure that dredged material disposal occurs in the least costly, environmentally acceptable manner, consistent with engineering requirements established for the project." 33 C.F.R. § 336.1(c)(1).

4

## Col. DeLony Letter

During the EA process, Colonel James W. DeLony, District Engineer, United States Army, wrote a letter to the mayors of the Brunswick County beaches to be affected by the SMP. In his letter, dated June 9, 2000, Colonel DeLony stated "[a]s we approach the decision point for the Finding of No Significant Impact (FONSI), I want to bring everyone up to date on the status of our plan to place beach quality sand excavated for the project on Bald Head Island, Caswell Beach, Oak Island, and Holden Beach" [DE 2-2]. The letter went on to outline the manner in which dredged material would be deposited at each of the sites following initial construction, in addition to outlining the planned disposal cycle that would follow periodic maintenance dredging of the navigation channels. *Id.* Additionally, the letter notified its recipients that should then-unforeseen adverse effects result from the depositing of beach quality dredged material on the beaches, the Corps would modify the SMP or attempt to implement corrective measures.

## Director Moffitt Letter

In accordance with the CZMA, North Carolina's Division of Coastal Management (NCDCM) was apprised of the Corps' Modified Wilmington 96 Project. On June 15, 2000, Donna Moffit, the Director of NCDCM, wrote to Colonel DeLony to express NCDCM's agreement that the Modified Wilmington 96 Project was "consistent with the North Carolina Coastal Management Program to the maximum extent practicable, provided that the project is performed according to the EA (including the Sand Management Plan and other appendices) and the Corps' responses to comments from the EA, and to Colonel DeLoney's letter of June 9, 2000 (including attachments), and that the conditions below are met" [DE 2-3]. The conditions outlined included the State's continuing concern for documentation and evaluation of the impact

5

of the Project on the coastal environment and its requirement that dredged material be deposited on the Brunswick County beaches in a manner consistent with the SMP; of particular concern to the NCDCM was the time of year that dredge spoils would be deposited on the beaches to ensure the least impact on local flora and fauna.

*FONSI*

In August 2000, after resolving outstanding concerns and obtaining all required environmental clearances, the Corps issued a Finding of No Significant Impact (FONSI) with regard to the Modified Wilmington 96 Project.[1] Notably, Plaintiff's direct concerns regarding the Project were represented in the FONSI and responded to by the Corps, which specifically found that "there is insufficient evidence to support the claim that the navigation project has adversely affected the Bald Head Island or the sand management system." (FONSI p. 79). The Corps went on to provide, in response to Plaintiff's concerns about the environmental impact of the Modified Wilmington 96 Project on Bald Head Island, that it had "committed to placing sand removed during normal maintenance cycles onto the beaches of Bald Head Island and Caswell beach" in accordance with the SMP. *Id.*

**Modified Wilmington 96 Project**

The Corps initiated dredging activities to realign the Inner Ocean Bar, and beach disposal of dredged material began in February 2001 and was completed in April 2002.[2] The Corps began the first cycle of maintenance dredging during the winter of 2004 – 2005, and continued to

---

[1] If appropriate, an agency may issue a FONSI following preparation of an EA as opposed to preparing an Environmental Impact Statement (EIS). *See* 40 C.F.R. § 1501.4.

[2] Information about the Corps' dredging activities can be found in USACE Physical Monitoring Reports, *available at* http://www.saw.usace.army.mil/wilmington-harbor/main.htm

6

perform maintenance dredging of the entrance channel during the winters of 2006 – 2007 and 2008 – 2009. Approximately one million cubic yards of beach quality material was deposited on Bald Head Island during the first and second maintenance dredging cycles. Maintenance dredging did not occur during the winter of 2010 – 2011, and Plaintiff has asked this Court for an injunction to ensure that maintenance dredging and subsequent deposition of beach quality material on Bald Head Island and neighboring beaches will occur during the winter of 2011 – 2012 and going forward.

## DISCUSSION

Defendants have moved to dismiss this action for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(1);12(b)(6).[3] As it is a threshold inquiry, the Court considers first whether it has subject matter jurisdiction over the instant action. *See Sucampo Pharm., Inc. v. Astellas Pharma, Inc.*, 471 F.3d 544, 548 (4th Cir. 2006) (noting that "the dismissal of a case on an issue relating to the merits of the dispute, such as failure to state a claim, is improper without resolving threshold issues of jurisdiction").

### Rule 12(b)(1)

The Plaintiff bears the burden of establishing federal subject matter jurisdiction when challenged by a motion under 12(b)(1), *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999), and a defendant may challenge the court's subject matter jurisdiction in one of two ways. A defendant may contend that the complaint fails to allege facts upon which subject matter

---

[3]Defendant-Intervenors oppose the Corps' Motion to Dismiss only as to Plaintiff's second claim for relief asserting an alleged violation of the CZMA.

jurisdiction can rest or it can contend that the jurisdictional allegations in the complaint are untrue. *Adams v. Bain,* 697 F.2d 1213, 1219 (4th Cir.1982). When, as Defendants here have done, a facial challenge to subject matter jurisdiction is made, "the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." *Kerns v. United States,* 585 F.3d 187, 192 (4th Cir. 2009) (quoting *Adams,* 697 F.2d at 1219). The facts alleged by the Plaintiff in the complaint are then taken as true, "and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Id.*

### I. APA Claims

The United States, as a sovereign, is immune from suit unless it consents to be sued. *United States v. Sherwood,* 312 U.S. 584, 586 (1941). The "terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *Id.* The Administrative Procedures Act (APA), 5 U.S.C. § 701 *et seq.*, provides that a person is entitled to judicial review if he has suffered a legal wrong because of agency action, or has been adversely affected or aggrieved by agency action. 5 U.S.C. § 702. Section 551 of the APA defines agency action to include "the whole or part of an agency rule, order, license, sanction, relief or the equivalent denial thereof, or failure to act." 5 U.S.C. § 551(13). An agency's failure to act is subject to judicial review if it is a failure to take an agency action as that term has been defined by the APA in § 551(13). *Norton v. S. Utah Wilderness Alliance,* 542 U.S. 55, 62 (2004) (hereinafter *SUWA*).

Provided no private right of action exists, agency actions are subject to judicial review under the APA only if they are "final" agency actions. 5 U.S.C. § 704; *SUWA,* 542 U.S. at 61-62. The Supreme Court has defined final agency action as those that "mark the consummation of

8

the agency's decisionmaking process," in addition to being "one by which rights or obligations have been determined or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). In order to be subject to judicial review, the complained of agency action must be a discrete action that the agency is required to take. *SUWA*, 542 U.S. at 2379. The Court may not therefore consider broad programmatic attacks, nor may it direct an agency in *how* it should act, but rather it may only compel "ministerial, non-discretionary act[s]." *Id.*

*Counts One through Six*

Plaintiff does not complain that the Corps has failed to properly examine the environmental impact of realigning the Wilmington Harbor Channel, nor has it alleged any deficiencies in the Corps' EA or FONSI, or that the Corps has abandoned its duty to maintain the Wilmington Harbor Channel. Plaintiff's primary concern is that the Corps has not dredged the Wilmington Harbor Channel in accordance with its intended schedule, and as a result Plaintiff has not received the beach quality material recovered from the Corps' dredging efforts when it expected it. At issue then before the Court is whether the specific plans for implementation of the Modified Wilmington 96 Project, as reported in the EA and the attached SMP and reflected in the letters of Col. DeLony and Director Moffitt, are agency actions or final agency actions as those terms are defined by the APA.

*Agency Action*

Plaintiff complains of the following conduct by the Corps and alleges that these acts represent discrete agency actions or failures to act: Defendants' failure to implement commitments made during the NEPA process, Defendants' failure to comply with obligations set forth in a letter from Director Moffitt in violation of the CZMA, Defendants' decision not to act

in accordance with the SMP to mitigate damage to Plaintiff in violation of the Rivers and Harbor Act, Defendants' failure to comply with their decision document for the Wilmington 96 Project in violation of Corps regulations, the Defendants' breach of the DeLony "contract" in violation of NEPA, and Defendants' violation of the Moffitt "contract" in violation of the CZMA. Specifically, Plaintiff contends that the SMP, the letter from Col. DeLony, and the letter from Director Moffitt, in and of themselves, constitute discrete agency actions or commitments upon which the Corps has failed to act.

*Final Agency Action*

Even assuming, *arguendo*, that Plaintiff has in fact alleged agency action, Plaintiff has failed to show that any of the alleged agency actions are final agency actions that might confer jurisdiction on the Court. As discussed above, only final agency actions are subject to judicial review, and Plaintiff has the "burden of identifying specific federal conduct and explaining how it is 'final agency action' within the meaning of section 551(13)." *Colorado Farm Bureau Federation v. U.S. Forest Service*, 220 F.3d 1171, 1173 (10th Cir. 2000).

Plaintiff contends that the implementation of the project planning documents "unmistakably marks the consummation of the Corps' decisionmaking process for the project." [DE 43 at 22]. With regard to the second prong of the *Bennett* test, Plaintiff points to the Corps' failure to implement the project in accordance with the planning documents, contending that "rights or obligations [were] determined" and memorialized in the EA and FONSI. *Bennett*, 520 U.S. at 177 - 78.

The final agency actions in existence here are the EA and FONSI issued by the Corps in 2000. But Plaintiff has not challenged the Corps' decision to realign Wilmington Channel

10

instead of deepening and widening the existing Channel, or its decision to issue a FONSI as opposed to engaging in a more in-depth investigation that would result in an Environmental Impact Statement. Plaintiff instead challenges the way in which the Corps has implemented the Modified Wilmington 96 Project.

The SMP, while incorporated by reference into the EA, serves only to detail what the Corps would do with the spoils of dredging. Whether the Corps is able to dredge in compliance with the SMP's projected two-year maintenance cycle is not the consummation of the agency's decisionmaking process, nor is it a decision by which rights or obligations have been determined or from which legal consequences will flow. *Bennett*, 520 U.S. at 177-178. Many factors might affect the Corps' ability to dredge particular sections of the Wilmington Harbor Channel at particular times, including, but not limited to, environmental considerations, port usage patterns, and available funding. Indeed, the SMP itself recognizes that "[w]hile the intent of the sand management plan is to return littoral material to the beach, the primary purpose of the project is to provide safe navigation through the entrance into Wilmington Harbor." (SMP ¶ 28). In support of this statement, the SMP provides that if problem shoals develop that require dredging off of the regular maintenance cycle in order to maintain safe passage through the Channel, the Corps recognizes that such dredging must occur even if it results in the Corps being unable to deposit beach quality dredge spoils on the neighboring beaches. *Id.*

The FONSI, EA, and SMP represent the Corps' plan to make a beneficial use of recovered beach quality material *when* it engaged in initial and maintenance dredging of portions of the Wilmington Channel. Nowhere in the Project documents is a rule or order that the Corps *must* perform maintenance dredging *so that* it might provide beach quality material to the

11

Brunswick County beaches. While the Corps has in fact initiated the Modified Wilmington 96 Project., and has continued to fulfill its duty of maintaining the Wilmington Harbor, it has been unable to implement the program according to its proposed maintenance cycle schedule. Implementation or continued operation of a project is not, however, federal agency action. *California Sportfishing Protection Alliance v. F.E.R.C.*, 472 F.3d 593, 599 (9th Cir. 2006).

Nor do the letters from Col. DeLony and Director Moffitt represent final agency action. The Col. DeLony and Director Moffitt letters, even if they are deemed to reflect commitments on the behalf of the Corps, serve only to memorialize the Corps' plan to make a beneficial use of beach quality sand recovered from dredging operations. They do not represent the culmination of a decionmaking process, nor do they give rise to legal rights or consequences. *See Colorado Farm Bureau Federation v. U.S. Forest Service*, 220 F.3d 1171, 1173 (10th Cir. 2000) ("an agreement between the U.S. Department of the Interior and the State of Colorado concerning a program to manage Colorado's declining native species" did not constitute final agency action). Accordingly, the Court finds that Plaintiff has failed to show that the SMP, the Col. DeLony letter, or the Director Moffitt letter constitute final agency action.

*Injunctive Relief*

Plaintiff also contends that NEPA and the APA provide a basis for injunctive relief that would allow the Court to compel the Corps to dredge the Inner Ocean Bar. NEPA is a procedural statute that requires only that agencies take a hard look at environmental impacts before engaging in major actions. *Nat'l Audubon Society v. Dept. of Navy*, 422 F.3d 174, 184 (4th Cir. 2005). NEPA cannot, therefore, serve as the basis upon which the Court might compel an agency to take a particular action outlined in its EA, FONSI, or EIS. Nor does the APA

provide a basis for the Court to enjoin the Corps and compel dredging of the Inner Ocean Harbor; the APA provides that a court may compel "agency action that was unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). As discussed above, none of the Modified Wilmington 96 Project documents create an independent duty on the Corps to dredge the Inner Ocean bar according to a particular schedule in order to deposit sand on the neighboring beaches. As the EA and FONSI make clear, the purpose of the Modified Wilmington 96 Project is to maintain the Wilmington Harbor as a deep-water port in an environmentally sound and cost-effective manner; the Modified Wilmington 96 Project is not a beach re-nourishment project for Brunswick County beaches.

Additionally, the language of EA and FOSNI specifically refute Plaintiff's contention that deposition of sand on the Brunswick County beaches is mitigation action that the Corps is required to take. *See* 40 C.F.R. § 1508.20. The FONSI specifically reflects that beach erosion is occurring on the Brunswick County beaches, that the Modified Wilmington 96 Project will not negatively impact the neighboring beaches, and that long term mitigation is not warranted. (FONSI p. 79). As there is no agency action that was unlawfully withheld or unreasonably delayed, Plaintiff has failed to allege a basis for injunction under APA § 706(1).

### Lack of Subject Matter Jurisdiction over APA Claims

It is not always patently obvious whether an action undertaken by an agency is "agency action" or "final agency action" as those terms are defined by the APA.[4] It is, however, clear that

---

[4] Indeed, something that is referred to by an agency as an "order" may not in fact be an "order" for purposes of the APA and determining subject matter jurisdiction in federal court. *See National Ornament & Elec. Light Christmas Ass'n, Inc. v. Consumer Product Safety Commission*, 526 F. 2d 1368 (2nd Cir. 1975) (finding that "the fact that the Commission initiated the Program by what it termed an order scarcely brings it within the definition").

13

the limitations on judicial review imposed by the APA serve to "protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which court lack both expertise and information to resolve." *SUWA*, 542 U.S. at 2381. While "action" has been interpreted to mean "comprehensively every manner in which an agency may exercise its power," it is only those actions that are final, and thus "mark the consummation of the agency's decisionmaking process" that are subject to judicial review. *Whitman v. American Trucking Associations*, 531 U.S. 457, 478 (2001) (quoting *Bennett*, 520 U.S. at 177-78). Accordingly, though there may indeed be a "strong presumption in favor of judicial review of administrative action," it remains not the province of the courts to interfere with agency discretion or to entangle themselves in provisional decisions.

It is important to recognize here that Plaintiff does not contend that the Corps has done anything with beach quality sand recovered from dredging operations other than what it agreed to do; beach quality dredge spoils were deposited on the Brunswick County Beaches following each dredging operation that has occurred since the Modified Wilmington 96 Project commenced. Nor has Plaintiff contended that the Corps has attempted to dredge and deposit dredge spoils outside of the seasonal restrictions discussed in Director Moffitt's letter, or that the deposition of dredged materials has actually resulted in environmental harms to the beaches that the Corps refuses to consider or evaluate. All that Plaintiff is trying to accomplish through this lawsuit is a determination that the Corps *must* dredge according to the proposed schedule outlined in the SMP and Col. DeLony's letter. The Court cannot, however, conclude that the Corps' planned maintenance cycle is anything more than a discretionary or interlocutory decision subject to

change, and is, therefore, not a final agency action that is subject to judicial review under the APA. Accordingly, this Court is without jurisdiction to consider Plaintiff's APA claims.

## II. Contract Claims

Plaintiff alleges breach of contract claims in claims five, six, seven, and eight. Each of these claims is based on either the Col. DeLony letter or the Director Moffitt letter, and alleges that those letters are memorializations of contracts between the Corps and the Brunswick County beaches and the Corps and the State of North Carolina. Counts five and seven concern the Col. DeLony letter and non-maritime contract claims, while counts six and eight concern the Director Moffitt letter and maritime contract claims.

*Breach of Non-maritime Contract*

The United States' waiver of sovereign immunity with respect to contract claims is embodied in the Tucker Act, 28 U.S.C. § 1491(a)(1), and the Little Tucker Act, 28 U.S.C. § 1346(a)(2). The Tucker Act confers jurisdiction only on the United States Court of Federal Claims to hear cases involving express or implied contracts with the United States. 28 U.S.C § 1491(a)(1). The Little Tucker Act confers concurrent jurisdiction on the district courts to hear contract claims involving the United States that do not exceed $10,000. 28 U.S.C. § 1346(a)(2). Plaintiff has not made a claim for monetary damages in its breach of contract claims, but rather seeks relief only in the form of an injunction and specific performance. "[T]he Tucker and Little Tucker Acts 'impliedly forbid' federal courts from ordering declaratory or injunctive relief, at least in the form of specific performance, for contract claims against the government, and . . . the APA thus does not waive sovereign immunity for such claims." *Robbins v. United States Bureau of Land Mgmt.*, 438 F.3d 1074, 1082 (10th Cir. 2006); *see also Foxworth v. United States*,

2010WL 3938267 (E.D.Va., 2010).⁵ Accordingly, this Court is without jurisdiction to consider Plaintiff's breach of non-maritime contract claims.⁶

*Breach of Maritime Contract*

46 U.S.C. § 30903(a) provides that the United States has waived sovereign immunity as to suits "in which, if a vessel were privately owned or operated, or if cargo were privately owned or possessed, or if a private person or property were involved, a civil action in admiralty could be maintained." "To ascertain whether a contract is a maritime one, we cannot look to whether a ship or other vessel was involved in the dispute[.] . . . Nor can we simply look to the place of the contract's formation or performance. Instead the answer depends upon the nature and character of the contract, and the true criterion is whether it has reference to maritime service or maritime transactions." *Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14, 23-24 (2004) (internal citation and quotations omitted).

The Corps' activities in maintaining the Wilmington Harbor may indeed lie in admiralty, but the letters at issue in Plaintiff's complaint do not. The subject of both the Col. DeLony letter and the Director Moffit letter is the process by which beach quality material would be deposited on the Brunswick County beaches. While the performance of the alleged contract was the Wilmington Harbor Channel, and a dredging vessel is involved in the dispute, the nature and

---

⁵Although the Fourth Circuit has found that a district court does have jurisdiction to order specific performance of contracts against the Government, it has done so only where such relief was expressly allowed in a different statute. *Foxworth*, 2010 WL 3938267 (E.D.Va., 2010) (citing *Charter Fed. Sav. Bank v. Office of Thrift Supervision*, 976 F.2d 203, 210 (4th Cir. 1992).

⁶Additionally, insofar as Plaintiff alleges that counts five and six are founded in the APA and not in contract, the Court remains without jurisdiction to consider these claims as Plaintiff has failed to allege any final agency action that is subject to judicial review.

16

character of the letters, insofar as they might be considered contracts, do not concern maritime transactions or commerce. Accordingly, as the letters from Col. DeLony and Director Moffitt could not constitute maritime contracts, this Court is without jurisdiction to consider whether a breach occured under 46 U.S.C. § 30903(a).

## CONCLUSION

Accordingly, for the reasons discussed above, this Court lacks subject matter jurisdiction to hear Plaintiff's claims and Defendants' Motion to Dismiss under Rule 12(b)(1) is therefore GRANTED. All other pending motions are DENIED AS MOOT.

SO ORDERED, this _10_ day of November, 2011.

*/s/ Terrence W. Boyle*
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE